[No. 32224. Department Two. March 10, 1953.]

HARVEY A. HAMMERBECK, *Respondent*, v. W. L. HUBBARD *et al., Defendants*, JESSIE E. RICHARDSON, *Appellant*.[1]

*Ralph M. Rogers*, for appellant.

*Claude M. Pearson* and *Cosgrove, Terhune & Schlosstein*, for respondent.

SCHWELLENBACH, J.—At about 10.45 p. m. on August 21, 1950, Mr. Hammerbeck was driving his automobile along the old Buckley-Sumner highway in Pierce county. Suddenly a horse jumped from the side of the road, striking the

---

[1]Reported in 254 P. (2d) 479.

side of the car. The automobile was damaged, and Mr. Hammerbeck received severe injuries.

Mrs. Richardson owned the farm adjacent to the scene of the accident. The horse was kept on the farm. In 1946, she sold the property to George Shelton under a real-estate contract. He remained there until 1950, when, after action had been commenced against him because he had not kept up his payments, he executed a quitclaim deed to Mrs. Richardson and moved off about July 7th. He left the horse in question, which had been purchased by her prior to 1946.

When Shelton left, the Hubbards moved in, and Mrs. Richardson moved to Kansas. Mrs. Hubbard is Mrs. Richardson's daughter. The arrangements between the parties will be discussed later in this opinion.

The complaint alleged: that the proximate cause of the accident was the negligence of the defendants in allowing the horse to be upon the highway and roaming at large; that defendants did not have proper facilities for pasturing and maintaining the horse; that they knew or should have known that the horse was upon the highway without being properly attended. Prior to the trial, the complaint was amended to allege that the defendant Richardson at all times stood in the relation of principal and master of defendants Hubbard, both of whom were acting as agents and servants of Mrs. Richardson, within the scope of their employment in controlling the horse.

After trial, the court entered findings of fact, conclusions of law, and judgment against Mrs. Richardson and the Hubbards. Mrs. Richardson is alone appealing.

We quote finding No. IV:

"That at all times mentioned herein the defendant Jessie E. Richardson was the full and sole owner of the particular horse which collided with the plaintiff's automobile, causing the damages and injuries to the plaintiff. That the defendant Jessie E. Richardson never did sell said horse to George Shelton but was at all times from the year 1946 up to the time said horse was killed on August 21, 1950, the full and sole owner of said horse.

"That at all times mentioned herein the defendant Jessie E. Richardson was the full and sole owner of that certain

Farm Real Property situated in Pierce County, State of Washington, and legally described as:

"The Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of Section Thirty-six (36), Township Twenty (20) North, Range Five (5) East of the Willamette Meridian, except roads.

"That said Farm is situated directly adjacent to the scene of the accident on the Old Buckley-Sumner Highway. That said Farm is situated within the boundaries of a Stock Restricted area properly constituted.

"That the defendant Mabel Hubbard is the daughter of the defendant Jessie E. Richardson and that the said defendant Jessie E. Richardson had on or about the 7th day of July placed both the defendants W. L. Hubbard and Mabel Hubbard, his wife, in possession of the said horse and the said farm subject to certain agreements and instructions as to the management and control of the farm and said horse more fully set forth hereinafter.

"That on August 21, 1950, the date of the accident herein, the defendants W. L. Hubbard and Mabel Hubbard, his wife, had possession of said horse and said farm and were charged with the custody, management and control of same by the defendant Jessie E. Richardson.

"That at the time of the accident herein, and with respect to the custody, management and control of the said horse and farm the relationship of principal or master and agent or servant existed between the defendant, Jessie E. Richardson and the defendants W. L. Hubbard and Mabel Hubbard, his wife. That the defendant Jessie E. Richardson was the principal or master and the defendants W. L. Hubbard and Mabel Hubbard, his wife, were the agents or servants in that the defendant Jessie E. Richardson placed the defendants W. L. Hubbard and Mabel Hubbard, his wife in possession of the horse and farm as aforesaid, directing them to keep the horse on the farm and care for said horse, authorizing the said defendants Hubbard to use the horse upon the farm or to sell the horse and use the proceeds to buy a calf to be kept and used upon the said farm; that said relationship of principal or master and agent or servant arose from other facts among which is the fact that it was agreed between the defendant Richardson and the defendants Hubbard that the defendants Hubbard have the use of said horse and said farm rent-free and that in return the defendants Hubbard would act as custodians of same, taking care of the horse, watering and feeding it regularly

supervising its pasturage and performing all necessary acts to keep said horse in good condition.

"That it was further agreed between the defendant Richardson and the defendants Hubbard that defendants Hubbard were to see to the general upkeep of the farm, keeping the buildings in repair and act as general caretakers of said farm and all of the fixtures and personal property situated thereon.

"That the authority vested in the defendants Hubbard by the defendant Richardson with respect to management of the said horse was demonstrated by the fact that the defendant W. L. Hubbard stated to the State Patrol officer, at the scene of the accident, that the defendant Jessie E. Richardson, his mother-in-law, owned the horse but that he, W. L. Hubbard, was the caretaker of the horse and that he, W. L. Hubbard, would authorize the officer to shoot the horse and put it out of its misery.

"That a further indication of the fact that a principal-agency relationship existed between the defendant Richardson and both the defendants Hubbard is the fact that both of the defendants Hubbard accepted general care, custody and management of the horse and farm and during the period between about July 7, 1950, and August 21, 1950, the date of the accident, performed repair work on the house situated on said farm and put the said horse out to graze and saw to the watering and feeding of said horse.

"That a further manifestation of the fact that a principal-agency relationship existed between the defendant Richardson and both the defendants Hubbard is the fact that during the period between about July 7, 1950 and August 21, 1950, the date of the accident herein, while both the defendants Hubbard continued in management and control of the horse and farm the defendant Jessie E. Richardson had a right of control over both defendants Hubbard with respect to her farm and horse and had the right in fact to direct any detail of the management of the farm she desired and that during said period and thereafter both the defendants Hubbard were bound to comply with her directions as to the control and management of both the horse and the farm.

"That on or about August 21, 1950 at some time before the accident herein the defendants W. L. Hubbard and Mabel Hubbard permitted the said horse out to graze upon the ditch in front of the farm and permitted it to roam and graze unattended upon the ditches and shoulders of the Old Buck-

ley-Sumner Highway near the place where the accident herein occurred. That said horse was permitted by them to roam and graze unattended at the time of said accident.

"That in permitting said horse out to graze on said shoulder and ditch on or about August 21, 1950, both defendants Hubbard were acting as custodian of said horse for and on behalf of the defendant Jessie E. Richardson, who had instructed them to see to the feeding, watering and general care of said horse; and both the said defendants Hubbard were also acting for and on behalf of themselves in so permitting the horse to graze unattended in that at that time they had the use of said horse and farm rent-free and were bound to furnish said horse with feed or forage."

It will be seen that this is a combination of findings, conclusions, and argument.

We hesitate to overthrow the findings of a trial court and will only do so when the evidence clearly preponderates against them. However, from an examination of this record, we feel compelled to disagree with some of the findings and conclusions appearing in finding No. IV.

First, we wish to state that we agree that Mrs. Richardson was the owner of the horse. But we disagree as to its control. State Patrolman Joe W. Davis was called to the scene of the accident. He testified that the horse was lying there injured and should be destroyed; that Hubbard stated that the horse had been left on the farm due to money being owed, and that his mother-in-law owned the farm. Officer Davis further testified, in response to questions by respondent's counsel:

"Q. And did he tell you to go ahead and kill the animal? A. It was arrived at, I believe, by mutual agreement of all parties, yes. Q. Did he imply that that would be the will of Mrs. Richardson? A. He had not implied that Mrs. Richardson at all. He had merely talked about it from the point of him taking care of the farm, and it had gotten out from his farm."

Mrs. Hubbard, the daughter, after testifying that her mother owned the farm, was asked:

"Q. And the horse? A. I wouldn't say it that way. Q. What way would you say it? A. Well, when we came there she said that as far as she knew it belonged to Mr. Shelton.

If he didn't come for it it was ours, or mine, in other words. Q. Did she tell you to keep the horse? A. She said she didn't care what I did with it. Q. Was it understood the horse was to be pastured on the farm? A. As far as she was concerned, she didn't care. If he didn't come for it we could keep it or sell it or trade it as we pleased. Q. And if she told you to sell it, why, of course you would sell it? A. No. Q. If she told you to? A. She never told us to, nor wouldn't. The stuff was give to me."

The liability of appellant depends entirely on the legal relationship between her and the Hubbards. The latter had four children at home. They had just moved to this state from Utah. Mrs. Richardson testified that they might live on the place, make it their home, "without any obligations to pay of any kind." While she was in Kansas and Colorado, she paid the taxes and insurance directly, without even sending them the money and asking them to do it for her. She realized that they could not make a living on the farm and that it would be necessary for them to work out. (In fact, at the time of the accident and through the time of the trial, both Mr. and Mrs. Hubbard were working at outside jobs.) She testified that the Hubbards were not subject to any directions she might give them with respect to the operation and management of the farm; that she told them they might do as they pleased. In response to the following question, she answered:

"Q. So if you wanted to do something with that farm you'd expect that they would do it, if you told them to? . . . A. Well, they've always been agreeable. I believe if I had asked anything they would have tried to abide by it."

She decorated the house, with her daughter's help, before they moved in. The daughter testified that it was the understanding between her mother and herself that they were to call the place their home, and that if she and her husband wanted to do anything to it that would be to their advantage, they could. She testified as to the arrangement with her mother:

"A. She was to furnish the house, we was to move in and make it our home, and it was understood we would have to

work out to make a living for the family. There was to be no rent. It wasn't to cost us anything to live in the house."

That is practically all of the testimony concerning the management and control of the farm. We fail to find any evidence in the record binding the Hubbards to comply with Mrs. Richardson's directions and control. We fail to find anything in the record to warrant a conclusion that a principal-agent or a master-servant relationship existed between the parties. Mrs. Richardson, out of the goodness of her heart, permitted her daughter and son-in-law and their four children to live on the farm and occupy the house, rent free. We feel that the trial court clearly recognized the arrangement, when the following took place during the trial:

"By Mr. PEARSON: Q. With respect to this agreement or understanding that you had with your mother when you moved into the place, you were aware that she had foreclosed on the prior owner, weren't you? A. Yes. Q. We're to understand that she wasn't to get a single thing out of the deal at all, is that your testimony? A. That's right. Q. Except that you were to live on the property and keep it up, is that right? A. Not to keep it up. We are just to live there. She said nothing about keeping it up. Q. Would it be fair to say that you understood that you should keep it up when you took it? MR. ROGERS: Objected to on the ground that it calls for a conclusion of the witness. MR. PEARSON: I am asking her about her understanding. MR. ROGERS: You are asking her if it is her conclusion. Call her as your own witness. You asked her for an expression of opinion. THE COURT: You asked her opinion or what she thought at the time they moved on the place. This conversation with her mother as to the tenancy of the property. She has already testified there was no conversation involved. You can ask her, it is just a mere question. What she had in mind as to— MR. PEARSON: It just seems to me it is kind of an unusual arrangement, that there isn't any benefit involved in the thing. THE COURT: *Just mother and daughter love and affection.*" (Italics ours.)

The relationship between the parties was that of landlord and tenant.

*Najewitz v. Seattle*, 21 Wn. (2d) 656, 152 P. (2d) 722, was an appeal from a judgment of dismissal entered on an

order sustaining a demurrer to an amended complaint. The complaint alleged that the city owned and operated a gravel pit; that there was a house on the property; that the city employed plaintiff as a watchman and caretaker of ·the property and "particularly employed plaintiff to move from said city into said house upon said tract of land"; that he was to put and keep the house and other improvements on the property in repair and in a useful condition; that the city, nine years later, ordered him off the property. The plaintiff prayed for injunctive relief, contending that his alleged cause of action was based upon a contract of employment. In holding that the agreement created a tenancy at will, we said:

"We think it is clear that the amended complaint, stripped of conclusions and argumentative allegations, merely sets up an agreement for the occupancy of real property. All declarations and conclusions to the contrary cannot change the legal relationship of the parties established by the ultimate facts alleged.

"The legal effect of the agreement pleaded created the relationship of landlord·and tenant, not that of employer and employee. In its simple and ultimate aspect, it was an agreement whereby plaintiff was permitted to occupy the house on the property in consideration of his services in taking care of and keeping the property in repair."

Having decided that the relationship as to the real property was that of landlord and tenant, it follows that the relationship as to the horse, it being the property of Mrs. Richardson and in the custody and control of the Hubbards, was that of bailor and bailee. 32 Am. Jur. 162, Landlord and Tenant, § 168.

A bailor not in control of the subject of the bailment is liable to a third person negligently injured thereby only in case he himself, or someone acting for him, has been negligent in respect of some duty owed to the person injured. The relation of bailor and bailee is not, as such, within the doctrine of *respondeat superior*. The bailor cannot be held responsible to a third person for injuries resulting from his bailee's negligent use of the bailed property, in the absence of any control exercised by the bailor

at the time of the negligence. Such a liability could only be sustained on the theory that a bailor stands in the relation of principal or master to the bailee, and such a relationship does not exist in the ordinary case of bailment. 6 Am. Jur. 410, Bailments, §§ 312 and 313.

The Hubbards are liable to respondent for resulting damages to him by permitting the horse to break outside of the fence and stray along the highway. Appellant, as bailor, did not exercise any control over the Hubbards, nor did they act for her, with respect to the horse. She would be liable if she left the horse with the bailees, knowing, or if she had reasonable grounds to believe, that it would break out and stray on the road. But there is absolutely no testimony to indicate that she knew that the fence was insecure or unwatched, or that the horse had any propensities to stray.

The judgment is reversed as to appellant.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.